Opinions of the Colorado Supreme Court are available to the public and can be accessed through the Judicial Branch's homepage at http://www.courts.state.co.us. Opinions are also posted on the Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
April 24, 2017

**2017 CO 32**

**No. 14SC634, City & Cty. of Denver v. Expedia, Inc.—Statutory Construction—Local Tax Ordinances.**

Denver petitioned for review of the court of appeals opinion reversing the judgment of the district court and remanding with directions to vacate the subject tax assessments against Expedia and the other respondent online travel companies ("OTCs"). See Expedia, Inc. v. City & Cty. of Denver, 2014 COA 87, ___ P.3d ___. The district court had largely upheld a Denver hearing officer's denial of protests by Expedia and the other OTCs to Denver's claim for unpaid taxes, interest, and penalties, assertedly due according to Denver's ordinance imposing a lodger's tax. Unlike the hearing officer and district court, the court of appeals concluded that the city lodger's tax article was at least ambiguous with regard to both the purchase price paid or charged for lodging, upon which the tax is to be levied, and the status of the OTCs as vendors, upon which the ordinance imposes the responsibility to collect the tax and remit it to the city; and the intermediate appellate court considered itself obligated to resolve all ambiguities in the lodger's tax article, being a tax statute, in favor of the OTCs.

The supreme court reversed the judgment of the court of appeals.  A majority of the court agreed that Denver's lodger's tax article imposes a duty on the OTCs to collect and remit the prescribed tax on the purchase price of any lodging they sell, to include not only the amount they have contracted with the hotel to charge and return but also the amount of their markup.

## The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

---

### 2017 CO 32

---

### Supreme Court Case No. 14SC634
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 13CA779

---

### Petitioners:

City and County of Denver, Colorado; Brendan Hanlon in his official capacity as the Chief Financial Officer of the City and County of Denver; and Bill Speckman, in his official capacity as Hearing Officer designated by the Chief Financial Officer,

v.

### Respondents:

Expedia, Inc.; Hotels.com, L.P.; Hotwire, Inc.; Orbitz, LLC; Priceline.com, Incorporated; Site59.com, LLC; Travel Webb LLC; Travelocity.com LP; and Trip Network, Inc. d/b/a Cheaptickets.com.

---

### Judgment Reversed
*en banc*
April 24, 2017

---

**Attorneys for Petitioners:**
Lewis Roca Rothgerber Christie LLP
Michael D. Plachy
Thomas M. Rogers
  *Denver, Colorado*

Hagens Berman Sobol Shapiro LLP
Andrew M. Volk
Christopher A. O'Hara
  *Seattle, Washington*

City Attorney for the City and County of Denver
Charles T. Solomon, Assistant City Attorney
  *Denver, Colorado*

**Attorneys for Respondents:**
Zonies Law LLC
Sean Connelly
  *Denver, Colorado*

Davis Graham & Stubbs
Jason M. Lynch
  *Denver, Colorado*

**Attorneys for Amici Curiae Colorado Municipal League and Colorado Association of Ski Towns:**
Colorado Municipal League
Geoffrey T. Wilson
  *Denver, Colorado*

**Attorneys for Amici Curiae Visit Denver and Colorado Hotel and Lodging Association:**
Brownstein Hyatt Farber & Schreck, LLP
Richard B. Benenson
  *Denver, Colorado*

**Attorneys for Amicus Curiae American Society of Travel Agents, Inc.:**
Blain Myhre LLC
Blain Myhre
  *Englewood, Colorado*

**JUSTICE COATS** announced the judgment of the Court and delivered an opinion, in which **JUSTICE MÁRQUEZ** and **JUSTICE BOATRIGHT** join.
**JUSTICE HOOD** concurs in the judgment.
**JUSTICE GABRIEL** dissents, and **CHIEF JUSTICE RICE** and **JUSTICE EID** join in the dissent.

¶1 Denver petitioned for review of the court of appeals opinion reversing the judgment of the district court and remanding with directions to vacate the subject tax assessments against Expedia and the other respondent online travel companies ("OTCs"). See Expedia, Inc. v. City & Cty. of Denver, 2014 COA 87, ___ P.3d ___. The district court had largely upheld a Denver hearing officer's denial of protests by Expedia and the other OTCs to Denver's claim for unpaid taxes, interest, and penalties, assertedly due according to Denver's ordinance imposing a lodger's tax. Unlike the hearing officer and district court, the court of appeals concluded that the city lodger's tax article was at least ambiguous with regard to both the purchase price paid or charged for lodging, upon which the tax is to be levied, and the status of the OTCs as vendors, upon which the ordinance imposes the responsibility to collect the tax and remit it to the city; and the intermediate appellate court considered itself obligated to resolve all ambiguities in the lodger's tax article, being a tax statute, in favor of the OTCs.

¶2 The application of well-accepted aids to statutory construction leads to the conclusion that the fair and reasonable interpretation of Denver's lodger's tax article is that it imposes a duty on the OTCs to collect and remit the prescribed tax on the purchase price of any lodging they sell, to include not only the amount they have contracted with the hotel to charge and return but also the amount of their markup. The judgment of the court of appeals is therefore reversed, and the matter is remanded for consideration of the remaining issues raised on appeal by the parties.

## I.

¶3      In July 2010, the City and County of Denver issued nine Notices of Final Determination, Assessment and Demand for Payment against various online travel companies:  Expedia, Inc.; Hotels.com LP; Hotwire, Inc.; Orbitz, LLC; Trip Network, Inc.; Priceline.com Incorporated; Travelweb, LLC; Site59.com, LLC; and Travelocity.com LP.  The Notices claimed unpaid taxes, penalties, and interest due according to the city lodger's tax article, Denver Revised Municipal Code ("D.R.M.C.") §§ 53-166 to -236, for the period from January 2001 through April 2010, totaling over $40 million.[1]  These online companies filed nearly identical protests, requesting hearings before a Denver Department of Finance hearing officer, and the protests were consolidated by stipulation.

¶4      Based on the stipulated evidence, including depositions and other materials from litigation in other jurisdictions and internal materials of the OTCs themselves explaining their operational methods and practices, the hearing officer found, and the parties do not dispute, that the OTCs operate under two basic business models.  Under what they describe as the "agency model," he found that the OTCs refer customers to hotels.  Lodgers then transact directly with the hotels, and the OTCs receive commissions in separate transactions.  Under what they describe as the "merchant model," by contrast, the OTCs operate in the transaction somewhere between lodgers

---

[1] Denver estimated the liabilities based on incomplete information.  After discovery during the administrative proceedings, the parties stipulated to the amount of liability under various scenarios, depending upon the hearing officer's determinations.  Pursuant to that stipulation, the websites faced potential liabilities totaling, at most, $7,573,506 (with interest computed through the date of the stipulation).

4

and hotels. Lodgers transact with the OTCs, prepaying for reservations, and the OTCs later pass part of those payments along to the hotels. The OTCs, not the hotels, appear as the merchant of record on lodgers' credit card statements—hence the term "merchant model." These two models have different pricing structures, about which again the parties do not disagree. In the agency model, the hotels maintain exclusive control over the purchase price paid by lodgers. In the merchant model, by contrast, the hotels set a rate they will accept, which the OTCs refer to as a "net rate," but the hotels grant the OTCs discretion, within designated limits, to set the price ultimately to be paid by the lodger. The OTCs then sell reservations to lodgers at that price, pass the amount of the so-called "net rate" plus a tax surcharge along to the hotels, and retain the difference as their own compensation.

¶5     For agency-model transactions, the hotels collect and remit lodger's taxes, just as they do for all other traditional bookings.[2] For merchant-model transactions, the hotels, as a matter of practice, have also been claiming the transactions on their own lodger's tax returns, but because the hotels do not transact directly with the lodgers, and because the hotels typically do not receive payment at the time of the transaction with the lodger, the process of collecting and remitting the lodgers' tax to the city is, in current practice, somewhat more convoluted. In practice, the OTCs typically collect a "surcharge" from the lodger at the time the lodger initially pays for a reservation. The OTCs then transmit that tax surcharge to the hotel along with the so-called "net rate," which transmission ordinarily occurs after the lodger checks out. Finally, the hotel

---

[2] Denver does not dispute the tax treatment of the OTCs' agency-model transactions.

remits the surcharged amount to the city, along with its other lodger's tax receipts for the month.

¶6     When booking reservations, the OTCs typically disclose two charges to lodgers. The first amount is the room rate, which is presented to the lodger as a single per-night rate that includes both the discounted rate to be returned to the hotel and the OTC's markup on that rate. The second amount is a taxes-and-fees charge, which is presented to the lodger as a single per-transaction amount but which actually has two components: what the OTCs refer to as a "service fee" and a surcharge for taxes.[3] Typically, the parties agree, the tax surcharge is computed on the "net rate," while the service fees are computed on the price charged to the lodger plus taxes.

¶7     To illustrate, Denver relied on the following example during administrative proceedings, using hypothetical numbers from the deposition of Expedia, Inc.'s corporate representative. Assume a website sells a reservation for $100, of which $75 will be paid to the hotel as the net rate and $25 will be retained by the OTC as its markup. If the applicable lodger's tax is 10%, it will be applied to the $75 net rate and the tax surcharge will therefore be $7.50. If the OTC's service charge is 5.5%, it will be applied to the so-called "retail price" plus taxes—i.e., to $107.50—and the service fee will therefore be $5.91. The lodger will see a room rate of $100 and a taxes-and-fees charge of $13.41, and will pay a total of $113.41. The OTC will retain both the markup

---

[3] The OTCs assert—and Denver does not dispute—that the service fees and taxes are bundled together into one line item in order to keep the hotels' net rates confidential, per contractual obligations. If the tax surcharges were displayed separately, a hotel's competitors could compute the hotel's net rate by dividing the applicable tax rate into the tax surcharge.

6

and the service fee ($25 plus $5.91, totaling $30.91)[4] and will eventually remit to the hotel the "net rate" and tax surcharge ($75 plus $7.50, totaling $82.50). The hotel then will remit the tax receipts ($7.50) on its next monthly lodger's tax return.

¶8 The hearing officer held that this practice for merchant-model transactions does not comport with the mandates of the city lodger's tax article for two reasons. First, he concluded that the OTCs' markups and service fees are "directly connected with" furnishing lodging, as contemplated by section 53-171(c) of the D.R.M.C., and therefore must be included within the tax base. Second, he concluded that the OTCs are "vendors," within the contemplation of section 53-170(8), and are therefore responsible for collecting and remitting taxes directly to the city. The hearing officer therefore upheld Denver's Notices.[5]

¶9 The OTCs sought judicial review as permitted by C.R.C.P. 106(a)(4). The district court rejected Denver's position regarding the applicable statute of limitations, holding instead that Denver could assert liabilities for only the preceding three years, but otherwise it upheld the hearing officer's determinations. On cross-appeals by the parties, the court of appeals concluded that the city lodger's tax article is at least

---

[4] The parties agree that, although the service fees roughly approximate the OTCs' transaction costs for credit-card vendor fees and the like, there is no substantive difference between the OTCs' markup and the service fees. Both types of receipts are booked as gross receipts, without a distinction from any accounting or tax perspective. Although the OTCs argued during administrative proceedings that the markups and service fees might be treated differently under Denver's ordinance, they have since abandoned that argument.

[5] The hearing officer voided Denver's asserted fraud penalties—which are no longer at issue in this case—and recomputed the liabilities based on the parties' stipulations, but otherwise upheld the Notices in full.

ambiguous as to both the question whether the OTCs are "vendors," with collect-and-remit obligations, and the question whether the tax base includes the OTCs' markups and service fees. Relying on its understanding that tax statutes must be construed strictly, the intermediate appellate court construed both provisions against the promulgating authority and ordered the case remanded with directions to vacate Denver's Notices.[6]

¶10 Denver petitioned this court for a writ of certiorari.

## II.

¶11 By ordinance, the City and County of Denver imposes a tax on the privilege of purchasing lodging in the city, and the tax thus imposed is to be paid by the person exercising the privilege. D.R.M.C. § 53-171(a). The amount of the tax is to be calculated as a percentage of the purchase price paid or charged for purchasing the lodging, § 53-171(b), and obligations are imposed on the vendor to add the amount of this tax to the purchase price or charge for lodging and pay to the city, on a monthly basis, an amount equivalent to the tax on all gross taxable sales, § 53-174(a).

¶12 The term "purchase or sale" is used as a term of art in the lodger's tax article to mean the acquisition or furnishing of lodging within the city for consideration. See § 53-170(4). Similarly, the term "lodging" is used as a term of art in the article to refer to rooms or accommodations for overnight use furnished to someone who has for consideration acquired the right to use, possess, or occupy any such room or

---

[6] The court of appeals did not reach Denver's cross-appeal as to the statute of limitations, and it is therefore not before this court.

8

accommodation in either a hotel or another of the enumerated similar establishments, under a concession, permit, lease, contract, license to use, or other similar arrangement. § 53-170(2). Finally, the term "vendor," as it is used in the lodger's tax article, refers specifically to a person making sales of lodging, or furnishing lodging, to a purchaser in the city. § 53-170(8).

¶13 No claim that the city's lodging tax article is unconstitutional, is preempted by statute, or is otherwise inoperable was implicated by the court of appeals judgment below. Therefore the questions pending before this court, concerning whether the OTCs are vendors and, if so, whether the purchase price upon which the lodging tax is to be calculated includes the OTCs' markup, turn entirely on the interpretation of the Denver lodger's tax article.

¶14 Like state statutes, city ordinances are a form of legislation and therefore have meaning according to the intent of the enacting body, as that intent is expressed in the language the enacting body has chosen for the particular ordinance itself. Dep't of Transp. v. Gypsum Ranch Co., 244 P.3d 127, 131 (Colo. 2010); City of Colorado Springs v. Securcare Self Storage, Inc., 10 P.3d 1244, 1248 (Colo. 2000). If an ordinance or statute is clear and unambiguous, and is not in conflict with another ordinance or statute, it must simply be applied as written. Holcomb v. Jan-Pro Cleaning Sys. of S. Colo., 172 P.3d 888, 890 (Colo. 2007). However, if the language in which legislation is written is susceptible of more than one reasonable interpretation, and is therefore considered ambiguous, a substantial body of interpretative aids, either provided by the legislative body itself to explain its own drafting conventions and preferences for avoiding or

9

resolving conflict, <u>see, e.g.</u>, D.R.M.C. §§ 1-3 to -12, or developed by courts over centuries, <u>see generally</u> Norman J. Singer & J.D. Shambie Singer, <u>Sutherland Statutes & Statutory Construction</u> (7th ed. 2007), is available to help determine which of these reasonable interpretations actually embodies the legislative intent. <u>People v. Jones</u>, 2015 CO 20, ¶ 10, 346 P.3d 44, 48.

¶15 These interpretative aids, or canons of construction, may take a number of different forms. As we have noted in the past, many reflect little more than grammatical or syntactical conventions; others largely reflect conventions followed in the process of legislative drafting; and still others purport to draw reasonable inferences from the relationship between legislative enactments and external events, or actually seek to reconstruct the purpose of drafters, sponsors, or even individual supporters with regard to legislative enactments. <u>See</u> <u>Union Pac. R.R. v. Martin</u>, 209 P.3d 185, 188 (Colo. 2009). Noteworthy for understanding the meaning of the tax provisions at issue here, a number of court-developed aids, or rules of construction, also express presumptions, or preferences, favoring, in the absence of adequate indication to the contrary, one over another class of litigants affected by the specific type of legislation at issue.

¶16 Included in this last group are policy preferences concerning the construction of statutes imposing burdens on property or liberty. In this jurisdiction, we have long accepted the proposition that statutes imposing a tax burden on the citizenry should be construed strictly, resolving doubts concerning their meanings in favor of the persons against whom an attempt is made to exact the tax. <u>Gomer v. Chaffee</u>, 6 Colo. 314, 317

(1882) ("It is a settled rule in the interpretation of revenue laws, that in case of doubt or ambiguity the construction must be in favor of the public." (citing Thomas M. Cooley, Law of Taxation 197–208 (1876, reprinted 1881)). Much like the closely related policy favoring lenity in the construction of criminal statutes, see Commissioner v. Acker, 361 U.S. 87, 91 (1959) (applying rule of lenity to civil tax penalties), however, this policy preference regarding tax burdens was never intended to displace other canons designed to help resolve doubts, or ambiguity. See, e.g., Douglas Cty. Bd. of Equalization v. Fid. Castle Pines, Ltd., 890 P.2d 119, 125–30 (Colo. 1995) (stating that "[g]enerally, we interpret ambiguous tax statutes in favor of the taxpayer," but also applying several other canons of construction and surveying legislative history); Stanley v. Little Pittsburg Min. Co., 6 Colo. 415, 419 (1882) (citing Cooley, supra, for the proposition that the presumption exists to maintain fidelity to legislative intent); cf. White v. United States, 305 U.S. 281, 292 (1938) ("It is the function and duty of courts to resolve doubts. We know of no reason why that function should be abdicated in a tax case . . . . Here doubts which may arise upon a cursory examination of §§ 101 and 115 disappear when they are read, as they must be, with every other material part of the statute, and in the light of their legislative history." (citation omitted)).

¶17    Rather, such policy preferences have often been characterized as rules of last resort, applicable only if, after utilizing the other relevant aids to statutory construction, the enacting body's intent remains obscured. See, e.g., People v. Thoro Prods. Co., 70 P.3d 1188, 1198 (Colo. 2003) (quoting from Muscarello v. United States, 524 U.S. 125, 138 (1998), to the effect that the "rule of lenity applies only if, after seizing everything from

11

which aid can be derived, . . . we can make no more than a guess as to what Congress intended," and from <u>United States v. Wilson</u>, 10 F.3d 734, 736 (10th Cir. 1993), to the effect that the "rule of lenity is a rule of last resort, to be invoked only after traditional means of interpreting the statute have been exhausted"); <u>BP Am. Prod. Co. v. Patterson</u>, 185 P.3d 811, 814 (Colo. 2008) (holding that rule favoring longer, rather than shorter, of two arguably applicable statutes of limitation, like analogous rules of choice applicable to statutes or contractual provisions generally, is a rule of last resort); <u>cf</u>. Lee R. Russ & Thomas F. Segalla, <u>Couch on Insurance</u> § 22:16 (3d ed. 1995) (characterizing the familiar principle that ambiguity in insurance contracts must be construed in favor of insured as a rule of last resort).[7]

---

[7] While Colorado retains, as a last resort, these rules of construction favoring one over another class of litigants affected by the specific type of legislation at issue, many commentators actually argue that these presumptions have been, or should be, discontinued altogether. <u>E.g.</u>, Antonin Scalia & Bryan A. Garner, <u>Reading Law: The Interpretation of Legal Texts</u> 359–63 (2012) ("Like any other governmental intrusion on property or personal freedom, a tax statute should be given its fair meaning, and this includes a fair interpretation of any exceptions it contains. . . . . [As to all such presumptions,] [t]he expressions to the contrary find their source either in a judicial proclivity to make difficult interpretive questions easy, or else in an inappropriate judicial antagonism to limitations on favored legislation."); <u>see also</u> Jasper L. Cummings, Jr., <u>The Supreme Court's Federal Tax Jurisprudence</u>, Ch. II.B. (2nd ed. 2016) (tracing history of presumptions in federal tax statutes, and concluding, "the tilt toward taxpayers in construing the federal tax statutes did not long survive the enactment of the income tax"); Singer & Singer, <u>Sutherland Statutes & Statutory Construction</u>, §§ 66:1 –:2 (listing as many applications of exceptions and contrary presumptions as applications of the original presumption against the government); Cooley, <u>supra</u>, at 205 ("There may and doubtless should be a distinction taken in construction of those provisions of revenue laws which points out the subjects to be taxed, and indicate the time, circumstances and manner of assessment and collection, and those which impose penalties for obstructions and evasions. There is no reason for peculiar strictness in construing the former. Neither is there reason for liberality.").

¶18　　It is also widely accepted that where the body enacting particular legislation has not expressly defined a term or otherwise limited its meaning, that term must be given its ordinary meaning.  See Taniguchi v. Kan Pac. Saipan, Ltd., 566 U.S. 560, ___, 132 S. Ct. 1997, 2002 (2012); Marquez v. People, 2013 CO 58, ¶ 8, 311 P.3d 265, 268.  Because, however, terms frequently have more than one ordinary meaning, or at least more than one shading or nuance of meaning, and because even a dictionary definition broad enough to encompass a particular sense of a word does not establish that the term is ordinarily understood in that sense, Taniguchi, 566 U.S. at ___, 132 S. Ct. at 2003, the precise meaning intended by an undefined term often must be determined by reference to other considerations, like the context in which it is used and the apparent purpose for its use, Marquez, ¶ 8, 311 P.3d at 268; see also Curious Theater Co. v. Colo. Dep't of Pub. Health & Env't, 220 P.3d 544, 549 (Colo. 2009).  In particular, we have often held that in the absence of some express indication to the contrary, a term or provision that is part of a greater statutory scheme should be interpreted, to the extent possible, harmoniously with the other provisions and purpose of that scheme.  Gypsum Ranch Co., 244 P.3d at 131; Frank M. Hall & Co. v. Newsom, 125 P.3d 444, 448 (Colo. 2005).  In this regard, a tax statute is no different from any other statute.  Welby Gardens v. Adams Cty. Bd. of Equalization, 71 P.3d 992, 995 (Colo. 2003); see also Walgreen Co. v. Charnes, 819 P.2d 1039, 1043 & n.6 (Colo. 1991) (requiring that particular Denver sales tax ordinance be construed in pari materia with entire scheme to effectuate the legislative intent).

13

¶19     The two issues resolved by the court of appeals by construing the lodger's tax article, or better, by declining to fully construe the lodger's tax article and instead resolving any perceived ambiguity in favor of the taxpayer, analytically involve one substantive question, concerning tax liability, and a separate administrative question, concerning the responsibility to collect whatever tax is due and remit it to the city. While it might appear that the more logical sequence for dealing with these two questions would be to address the existence and extent of any tax liability before assigning responsibility for its collection and remittance, perhaps because only assessments against the OTCs are at issue in this litigation and therefore a determination that they are not responsible to collect or remit any lodging tax should end the matter, the parties and the intermediate appellate court have not addressed the issues in that sequence. For that reason, and because we believe the purchase price of lodging, or tax base, to be integrally related to the sale, and therefore the seller, or "vendor," of that lodging, we will follow suit and address the administrative question first.

**A.**

¶20     Although the tax is imposed on the purchaser, the obligation to collect it and remit it to the city falls on the vendor, and for that reason, the court of appeals appropriately concerned itself with the definition of "vendor" in the article. It determined that according to the article's definition, the term "vendor" refers to a person who furnishes lodging, and since the lodger's tax article itself nowhere defines the term "furnish," the court turned to dictionary definitions of that term and case law

14

in other contexts to determine its ordinary meaning. Further finding that the OTCs' primary contention—that the person who furnishes lodging is the one who actually provides access to a specific room—was at least a reasonable interpretation of the article, the intermediate appellate court considered itself bound to accept that interpretation.

¶21 While the article somewhat unusually defines "purchase or sale" as a single term, there appears to be no dispute that it can only be understood to intend that "purchase" refers to the acquisition of lodging within the city by any person for consideration, and that "sale" refers to the furnishing of lodging within the city by any person for consideration. See § 53-170(4). That being the case, the court of appeals was undoubtedly right in concluding that the word "or" in the definition of "vendor" was not used in its disjunctive implication but rather to introduce a synonymous phrase. See People v. Swain, 959 P.2d 426, 430 n.12 (Colo. 1998) ("Generally, the word 'or' is a disjunctive particle that denotes an alternative; however, the word 'or' may also be utilized as a 'coordinate conjunction introducing a synonymous word or phrase or it may join different terms expressing the same idea or thing.'" (quoting State v. Ramsey, 430 S.E.2d 511, 514 (S.C. 1993))). As the definition of "sale" makes clear, furnishing lodging to a purchaser is simply the equivalent of, or another way of saying, making a sale of lodging. By concluding, however, that a "vendor" is therefore one who merely "furnishes lodging," the court of appeals too narrowly circumscribed the equivalent definitions and thereby mistakenly considered itself free to look to the "ordinary meaning" of the term "furnish."

15

¶22    Read together, the definitions of "purchase or sale" and "vendor" unmistakably lead to the conclusion that the term "vendor" does not refer simply to someone who <u>furnishes lodging</u>, as the court of appeals reasoned, but rather to someone who <u>furnishes lodging for consideration</u>, and further, only to someone who furnishes lodging for consideration to a person who acquires that lodging for that consideration. <u>See</u> § 53-170(4), (8).  Making a sale of lodging, or furnishing it for consideration, on the one hand, and purchasing that lodging, or acquiring it for consideration, on the other, are defined as opposite but corresponding aspects, or what could be characterized as flip-sides, of the same transaction.  While the term "furnish" may not be separately defined in the article, as the court of appeals and OTCs correctly point out, the phrase "furnishing lodging to a purchaser," appearing in the definition of "vendor," is made synonymous with "making sales" of lodging, as the court of appeals also explains. "Furnishing lodging," as used in the definition of "vendor" therefore cannot mean simply providing a room, in the sense of controlling physical access to it, but can only mean making a sale of lodging.

¶23    By contrast with the term "furnish," the term "lodging" is expressly defined as a term of art, and that definition similarly makes clear that furnishing lodging refers to selling, or providing for consideration, "the right to use, possess, or occupy qualifying accommodations."  While the definition might have been phrased more felicitously in terms of the overnight use of certain rooms or accommodations, rather than as "rooms or accommodations for overnight use," when the definition is read as whole and in context, the choice of subject and placement of a modifying prepositional phrase creates

16

no ambiguity. There can be no serious question that "lodging" does not refer to a room, as a commodity, or even title or a right of ownership of a room, but rather to the right of overnight use of rooms meeting all of the specifications of the definition. Because only the right to overnight use of rooms can be furnished and acquired for consideration without removing the transaction from the definition of "lodging" altogether, furnishing lodging for consideration necessarily refers to selling, or providing for consideration, the right to overnight use of rooms or accommodations in the enumerated hotel-like facilities.

¶24 Although the OTCs maintain that even in merchant-model transactions they do not sell, or furnish for consideration, a right to occupy or use the hotel rooms in question, no matter what terminology they may choose to use in describing their transactions, as a functional matter that is precisely what they do. See Apollo Stereo Music Co. v. City of Aurora, 871 P.2d 1206, 1211–12 (Colo. 1994) (holding that vending-machine owners, rather than owners of stores in which vending machines sit, are the vendors for purposes of sales taxes in light of the control they actually exercised over the machines, and especially over the access to and distribution of the moneys deposited in the machines); People v. Becker, 413 P.2d 185, 186 (Colo. 1966) ("It is a familiar and well documented rule of law that taxation is concerned with realities and that, in considering tax matters, substance and not form should govern.").

¶25 However characterized, virtually every aspect of the merchant-model transaction objectively places an OTC in the role of "vendor." The OTC deals directly in the transaction with the consumer-purchaser. The OTC sets the price, or consideration,

17

without the payment of which, the OTC will not sell the consumer the right to use the room; the OTC collects the amount of that purchase price directly from the consumer; and the OTC adds to the purchase price an amount it determines to be sufficient for the lodger's tax. Whether or not a particular room is specified at that point, in accepting the purchase price the OTC sells a reservation for a room of particular specifications to a consumer, and by its arrangement with the hotel, the hotel becomes contractually obligated to the OTC to provide the consumer with a room meeting those specifications.

¶26 Although the OTCs may choose to characterize themselves as mere intermediaries in a transaction between the hotels and the consumers, their relationship with the hotels is clearly not one remotely resembling an agency relationship. The OTCs are not employed by the hotels nor are they paid a fee, or commission, by the hotels for arranging reservations, as in the traditional agency model. The obligations of the OTCs and hotels to each other are purely contractual in nature, and to the extent the purchaser of lodging acquires rights from the hotel, it is at most as a third-party beneficiary of the contractual arrangement between the hotel and OTC. Whoever may actually hand the purchaser the key, the lodger is the purchaser in a transaction of sale with the OTC.

¶27 By the same token, however, although the OTCs pay an amount that is set by the hotels to them for each room reservation the OTCs make, and contractually retain the right to charge more in their subsequent sales to lodger-purchasers, neither are their arrangements with the hotels in the nature of wholesale purchases. The OTCs' separate transactions, first with the hotels and then with lodgers, are not in the nature of

18

wholesale and retail sales for the simple reason that the OTCs never acquire the right to occupy or use the rooms in question. They merely contract for the authority to sell to consumers, or lodgers, the right to occupy or use rooms, in agreed upon numbers or as available, at a price largely of their own choosing, in exchange for an agreement to return a specified amount to the hotels for each reservation not timely cancelled. If the OTCs actually purchased the right to occupy or use the rooms at a wholesale rate and resold that right at a retail rate, in the absence of some other provision in the tax code as provided for various commodity sales, the first sale would itself be a taxable event, with a second sale resulting in at least partial double taxation.[8]

¶28 The lodger-purchaser in the transaction is in privity of contract with the OTC, not the hotel. By virtually all objective criteria, the contract for sale of the right to use a hotel accommodation is entered into by the OTC and purchaser, at the time of the OTC's acceptance by receiving payment of the amount it charges for the reservation. There is of course nothing improper in attempting to structure transactions to the advantage of one's clients, and within ethical limits, that is precisely what lawyers are typically retained to do. But labelling alone is insufficient to alter the structure of a transaction. Apollo Stereo Music Co., 871 P.2d at 1211–12; Becker, 413 P.2d at 186. If tax obligations are imposed on the basis of function, then objective criteria establishing the functional relationships involved in any particular transaction must be determinative of the relative tax obligations. Any fair and reasonable interpretation of the city lodger's

_____

[8] At this point, Denver does not claim from the OTCs tax arrearages on the full amount of the purchase price paid or charged but only past due lodger's tax on the OTCs' markup, which has not already been remitted by the hotels.

tax article categorizes the OTC in a merchant-model transaction, according to the objective criteria of the article's definitions, as the vendor, with the obligation to collect and remit a lodger's tax to the city.

**B.**

¶29    Not only is the lodger's tax imposed on the person actually purchasing lodging in the city, but the amount of the tax thus imposed is expressed as a percentage "of the price paid or charged" for the purchase in question.  § 53-171(a), (b).  For the obvious reasons that a single money transaction may involve the purchase and sale of more than lodging alone and that a vendor may attempt to differentiate the cost of lodging and the cost of related goods or services for tax purposes, despite their inseparability from the purchase and sale of the lodging itself, the article further specifies that "the price paid by the purchaser for any goods, services or commodities other than those directly connected with, and included in the price of, the furnishing of rooms or accommodations" is not to be included as part of "the purchase price" from which the lodger's tax is to be calculated.  § 53-171(c).  The court of appeals focused on the meaning of the phrase "directly connected with" in the ordinance, and because it had already found it reasonable to conclude that the OTCs do not furnish lodging at all, it similarly considered it reasonable to conclude that the OTCs' markups, which they characterize as compensation for providing travel-related information and online facilitation services, are not directly connected with furnishing lodging.

¶30    Because we reach a different conclusion with regard to the meaning of "furnishing" and therefore the OTCs' role in furnishing lodging, we must similarly find

the intermediate appellate court's resolution of the tax base question, based on its understanding of the meaning of "furnishing," to be unsupported by the text of the article. The appellate court was, however, undoubtedly correct in inferring from the context a relationship between the purchase price charged for lodging and the vendor charging that price. If, as we now make clear, the OTC is actually the vendor in a merchant-model transaction, making sales of lodging by exchanging the right to use or occupy a room for the purchaser's payment of the price the OTC has decided to charge for the use of that room, it would not be unnatural for the tax scheme to intend by the "purchase price paid or charged," the price assessed by the OTC, without the payment of which the OTC would not sell, and the purchaser could not acquire, the room reservation in question.

¶31 In emphasizing that certain "goods, services or commodities" are not to be considered part of the "purchase price paid or charged for lodging," for lodger's tax purposes, the article circumscribes the exempted "goods, services or commodities" with the limiting phrase, "other than those directly connected with, and included in the price of, the furnishing of rooms or accommodations." There is no dispute that the cost of goods, services, and commodities other than those specifically excluded according to this formula are instead to be taxed as part of the purchase price paid or charged for the lodging. Beeghly v. Mack, 20 P.3d 610, 613 (Colo. 2001) ("Under the rule of interpretation expressio unius exclusio alterius, the inclusion of certain items implies the exclusion of others."). While the word "and" is typically, and perhaps even presumptively, used as a coordinating conjunction, joining two elements of identical

21

construction and equal grammatical rank, it is also a word long acknowledged to serve a wide-range of different functions, depending upon syntax and context. See, e.g., Clyncke v. Waneka, 157 P.3d 1072, 1079 (Colo. 2007) (Coats, J., concurring) (quoting Peacock v. Lubbock Compress Co., 252 F.2d 892, 893 (5th Cir. 1958), to the effect that "and" is a word having no "single meaning, for chameleonlike, it takes its color from its surroundings"); see generally 2 Corpus Juris 1337 (1915) (stating, in definition of "and," that "[w]hile the word is generally used in a conjunctive sense, this is not its invariable use; it is often employed to indicate a connection of what follows with what has gone before in the way of narration or description").

¶32     As the Denver ordinances themselves expressly contemplate, the words "and" and "or" may be functionally interchangeable, depending upon context and usage in a given sentence. See D.R.M.C. § 1-2(10) ("'Or' may be read 'and,' and 'and' may be read 'or,' if the sense requires it."). More subtly, however, even when a conjunctive, rather than disjunctive, meaning is clearly intended, a number of different relationships may be intended between the conjoined elements. The conjoined elements may be completely independent or synonymous, but often their meanings overlap with one, or both, serving to further define or clarify the sense in which the other is being used. See Arthur v. Cumming, 91 U.S. 362, 364, 23 L. Ed. 328 (1875) (noting "many instances in which two phrases with the like conjunction between them have been used to designate the same thing," a construction "obviously done to make clear and certain the meaning of the legislature, and to leave no room for doubt upon the subject").

¶33    While the use of commas to set off the second conjoined phrase—"and included in the price of"—suggests that it was intended to operate in apposition to, or as the functional equivalent of, the first phrase—"directly connected with"—the meaning of both phrases is ultimately dictated by context and their use specifically in reference to the "furnishing of rooms or accommodations."  See United States v. Ron Pair Enters., Inc., 489 U.S. 235, 251 (1989) ("Although punctuation is not controlling, it can provide useful confirmation of conclusions drawn from the words of a statute.").  For the reasons we have already articulated, the term "furnishing" in this context means making sales of, or selling, the right of overnight use of rooms or accommodations constituting lodging.  There can therefore at least be little doubt that the purchase price of services directly connected with and included in the price for which the lodging in question is sold is to be included in the tax base.

¶34    Whether or not the conjoined conditions of being directly connected with and being included in the selling price of the lodging are precisely synonymous, they are clearly attempts to describe a determinable amount that is neither based on the fortuity of being included in a single payment by the purchaser nor subject to manipulation by the labelling choices of the vendor.  Cf. Apollo Stereo Music Co., 871 P.2d at 1211–12; Becker, 413 P.2d at 186.  Functionally, the selling, and therefore purchase, price of lodging is the amount without the payment of which the lodging will not be furnished by sale, and therefore cannot be acquired by purchase.  However this amount is broken out, or characterized, in the billing process, if the purchaser has no option but to pay it

23

to the vendor as part of the purchase of the lodging in question, it is necessarily both included in and directly connected with the price for which that lodging is sold.

¶35 In the typical merchant-model transaction, as described for purposes of these proceedings, the OTC's markup is not distinguished in the billing process from the amount to be returned to the hotel at all, much less charged as a separate fee for informational and online services. However, whether or not such a fee could be objectively justified in terms of the service provided, because the purchaser has no option to decline it in making his purchase of lodging from the OTC, and it is therefore inseparable from the selling price of the lodging, it is directly connected with, in the sense that it is necessarily included in, that selling price. When the related provisions and interlocking definitions of the lodger's tax article are considered as a harmonious whole, the conclusion that the OTC's markup must be included in the purchase price paid or charged for lodging is not only one reasonable construction of the article; it is sufficiently apparent that it is the fair and reasonable construction embodying the legislative intent.

### III.

¶36 Because the application of well-accepted aids to statutory construction leads to the conclusion that the fair and reasonable interpretation of Denver's lodger's tax article is that it imposes a duty on the OTCs to collect and remit the prescribed tax on the purchase price of any lodging they sell, to include not only the amount they have contracted with the hotel to charge and return but also the amount of their markup, the

24

judgment of the court of appeals is reversed, and the matter is remanded for

consideration of the remaining issues raised on appeal by the parties.

**JUSTICE HOOD** concurs in the judgment.
**JUSTICE GABRIEL** dissents, and **CHIEF JUSTICE RICE** and **JUSTICE EID** join in the dissent.

25

JUSTICE HOOD, concurring in the judgment.

¶37 I agree with the plurality that under Denver's lodging tax ordinance ("the ordinance"), Denver, Colo., Revised Municipal Code §§ 53-166 to -236 (2016), the OTCs are vendors who must collect and remit the prescribed tax on the entire purchase price of the lodging they sell. However, I disagree with the plurality's rationale for reaching this result. Rather than viewing this outcome as a "fair and reasonable interpretation" of the ordinance, pl. op. ¶ 2, I believe the ordinance is unambiguous regarding the OTCs' obligation to collect lodging tax on the entire purchase price. I therefore concur in the judgment only.[1]

¶38 The primary goal of statutory interpretation is to effectuate the enacting body's legislative intent. BP Am. Prod. Co. v. Colo. Dep't of Revenue, 2016 CO 23, ¶ 15, 369 P.3d 281, 285. This requires first looking to the plain language of the ordinance, construing words and phrases according to their ordinary meaning. Id. "A tax statute is no different than any other statute; it must be construed as a whole in order to give consistent, harmonious, and sensible effect to all of its parts." Welby Gardens v. Adams Cty. Bd. of Equalization, 71 P.3d 992, 995 (Colo. 2003). If the language is clear and unambiguous, our analysis is complete: we look no further, and we apply the ordinance

---

[1] I am particularly concerned by and specifically decline to join in the plurality's discussion of certain interpretive aids it characterizes as "policy preferences concerning the construction of statutes imposing burdens on property or liberty." Pl. op. ¶ 16. The plurality weakens the force of these interpretive aids, referring to them as "rules of last resort" and claiming that "many commentators actually argue that these presumptions have been, or should be, discontinued altogether." Id. at ¶ 17 & n.7. Because I consider the ordinance unambiguous, I do not believe there is any need to reach the applicability of interpretive aids to construction, or to call their value into question.

1

as written.  <u>Jefferson Cty. Bd. of Equalization v. Gerganoff</u>, 241 P.3d 932, 935 (Colo. 2010).  But if the language is susceptible to multiple interpretations, and therefore ambiguous, we may resort to various aids to statutory construction.  <u>Id.</u>

¶39　The court of appeals began its interpretive inquiry with the definition of "vendor," because the ordinance requires only "vendors" to collect and remit the tax. Because the ordinance defines "vendor" as "a person making sales of or furnishing lodging," § 53-170(8), and further defines "sale" as "furnishing for consideration," <u>see</u> § 53-170(4), the court of appeals concluded that a "vendor" under the ordinance "refers only to one who actually furnishes lodging," <u>Expedia, Inc. v. City & Cty. of Denver</u>, 2014 COA 87, ¶ 38, __ P.3d __.  Because the ordinance does not define "furnish," the court of appeals looked to the ordinary meaning of that word, which the court determined was "to equip; to provide or supply with something that is necessary, useful, or desired."  <u>Id.</u> at ¶ 39 (quoting <u>Broadmoor Hotel, Inc. v. Dep't of Revenue</u>, 773 P.2d 627, 629 (Colo. App. 1989)).  The court of appeals then accepted the OTCs' argument that they merely facilitate hotel reservations rather than equip, provide, or supply rooms, and therefore that they are not vendors.  The court concluded that the OTCs had articulated a reasonable interpretation of the ordinance, demonstrating that the ordinance was at least ambiguous and should be construed in the OTCs' favor.  <u>See</u> <u>City of Boulder v. Leanin' Tree, Inc.</u>, 72 P.3d 361, 367 (Colo. 2003) (explaining that doubts in tax statutes should be resolved against the government and in favor of the taxpayer).

¶40 In my view, the court of appeals inappropriately focused on the meaning of "vendor" to the exclusion of other provisions in the ordinance, and it thereby neglected to follow the well-established principle of statutory interpretation that a tax statute, like any other statute, "must be construed as a whole in order to give consistent, harmonious, and sensible effect to all of its parts." Welby Gardens, 71 P.3d at 995; see also Colo. Dep't of Revenue v. Cray Comput. Corp., 18 P.3d 1277, 1282 (Colo. 2001) (determining scope of tax exemption based on unambiguous language of statute after construing statute as a whole and defining integral term according to common usage); Mesa Verde Co. v. Montezuma Cty. Bd. of Equalization, 898 P.2d 1, 5 (Colo. 1995) (determining disputed issue based on plain language of statute and noting that "[t]his interpretation is consistent with the statute read as a whole").

¶41 The ordinance levies the tax on "every person exercising the taxable privilege of purchasing lodging." § 53-171(a). "Purchase" and "sale," though defined as one term in the ordinance, mean the acquisition and furnishing, respectively, of lodging for consideration. See § 53-170(4). Vendors are made responsible for collecting the tax at the time they make a sale. § 53-173(a). A "vendor," as discussed above, is "a person making sales of or furnishing lodging to a purchaser in the city." § 53-170(8).

¶42 What, then, is "lodging," for purposes of the ordinance? "Lodging" is defined as "rooms or accommodations for overnight use furnished by any person . . . to any person who for consideration uses, possesses, occupies or has the right to use, possess or occupy any such room." § 53-170(2). Using the ordinary meaning of "furnish," as identified by the court of appeals, lodging must mean rooms provided or supplied to

3

any person who for consideration uses or has the right to use such rooms. Nothing in the definition of "furnish"—or elsewhere in the ordinance—limits that term to the physical provision of a hotel room.

¶43 When a customer uses an OTC's website to purchase a room, the OTC charges the customer's credit card at the time of the booking and is the merchant of record for the transaction. The customer receives a hotel confirmation number, but even this comes by way of the OTC, and the customer's entire transactional relationship is with the OTC, not the hotel. Thus, the OTCs provide or supply rooms to customers who pay consideration to the OTCs in exchange for rooms or the right to use rooms. The OTCs are vendors furnishing lodging within the plain meaning of the ordinance.

¶44 This is the only interpretation that harmonizes all parts of the ordinance and effectuates its stated intent. Characterizing the OTCs as mere intermediaries responsible solely for facilitating the booking of reservations would ignore that purchasers acquire rooms by providing consideration to the OTCs, not to hotels. And it would render ineffective the ordinance provision governing the collection of the tax, which states: "Every vendor making sales to a purchaser . . . at the time of making such sales is required to collect the tax imposed by [the ordinance] from the purchaser." § 53-173(a). In a merchant-model transaction, only the OTC, and not the hotel, collects payment from the purchaser.[2] Finally, exempting the OTCs from the definition of

---

[2] Because the OTC, and not the hotel, collects payment from the purchaser, under the current state of affairs, the OTC also collects the lodging tax levied on the underlying room rate charged by the hotel. See pl. op. ¶ 7 (using hypothetical to illustrate merchant-model transaction). The OTC later remits both the underlying room rate and

4

"vendor" would leave a portion of the price paid for lodging untaxed, thereby frustrating rather than effectuating the city council's clear intent to tax that purchase.

¶45 For these reasons, under the plain language of the ordinance, the OTCs are vendors and must collect and remit the prescribed tax on the entire purchase price of any lodging they sell. Because I believe the ordinance to be unambiguous in requiring this result, I do not see a need to resort to the use of interpretive aids. I therefore respectfully concur in the judgment only.

---

the tax surcharge to the hotel. See id. In my view, this practice amounts to implicit acknowledgment by the OTCs that they are vendors, because they are the ones collecting the lodging tax from the purchasers at the time of sale. See § 53-173(a) (setting forth provisions governing collection of lodging tax). And, as Denver emphasized in its briefs, the OTCs repeatedly presented themselves as "providers" and "resellers" of lodging in SEC filings pre-dating this litigation, which further suggests that they perceive themselves, at least in a functional sense, as vendors.

JUSTICE GABRIEL, dissenting.

¶46     The plurality concludes that the respondent online travel companies ("OTCs") furnished lodging within the meaning of the Denver Revised Municipal Code (the "Code") because they sold or provided to customers for consideration the right to the overnight use of rooms or accommodations.  See pl. op. ¶¶ 23–24.  The plurality thus concludes that the OTCs are "vendors" subject to Denver's lodging tax.  See id. at ¶¶ 25, 28.  The plurality further concludes that the fees charged by the OTCs for their services were directly connected with furnishing rooms.  See id. at ¶¶ 29–30, 33–35.  Accordingly, the plurality concludes that these fees were part of the cost of lodging and were also subject to Denver's lodging tax.  See id.

¶47     Because I do not believe that Denver's ordinances support these conclusions, I respectfully dissent.

## I. Analysis

¶48     I first address the applicable standard of review and principles of construction of municipal ordinances such as those at issue here.  I proceed to address whether the OTCs furnished lodging, which would render them "vendors" subject to Denver's lodging tax.  I conclude by considering whether the fees charged by the OTCs to their customers were directly connected with the furnishing of rooms or accommodations and thus subject to Denver's lodging tax.

1

## A. Standard of Review and Principles of Construction

¶49    When reviewing a municipal ordinance or code, we construe it using the same rules that we use when we interpret statutes. See Town of Erie v. Eason, 18 P.3d 1271, 1275 (Colo. 2001).

¶50    We review de novo questions of law concerning statutory construction. City of Littleton v. Indus. Claim Appeals Office, 2016 CO 25, ¶ 27, 370 P.3d 157, 165.

¶51    Our purpose in interpreting a statute or ordinance is to give effect to the intent of the legislature or city council. See id. at ¶ 27, 370 P.3d at 165–66. To discern this intent, we look first to the language of the statute or ordinance. See id. at ¶ 27, 370 P.3d at 166. We construe the statute or ordinance as a whole to give effect and meaning to all of its parts, and we avoid interpretations that render provisions either superfluous or absurd. Id.; Concerned Parents of Pueblo, Inc. v. Gilmore, 47 P.3d 311, 313 (Colo. 2002).

¶52    If the applicable language is clear and unambiguous, we do not resort to legislative history or other rules of construction. City of Littleton, ¶ 27, 370 P.3d at 166. Rather, we give the words used their plain and ordinary meanings. See Concerned Parents, 47 P.3d at 313.

¶53    If, however, the language of the statute or ordinance is ambiguous, then we may examine the legislative intent, the circumstances surrounding the adoption of the statute or ordinance, and the possible consequences of various interpretations to determine the proper construction of that statute or ordinance. Coffman v. Williamson, 2015 CO 35, ¶ 23, 348 P.3d 929, 936. A statute or ordinance is ambiguous if it is reasonably susceptible of multiple interpretations. Id.

2

¶54 Finally, I note that "[i]t is a longstanding rule of construction in this jurisdiction that tax statutes 'will not be extended beyond the clear import of the language used, nor will their operation be extended by analogy. . . . All doubts will be construed against the government and in favor of the taxpayer.'" City of Boulder v. Leanin' Tree, Inc., 72 P.3d 361, 367 (Colo. 2003) (quoting Transponder Corp. v. Prop. Tax Admin., 681 P.2d 499, 504 (Colo. 1984)). In this regard, I disagree with the plurality's assertion that the foregoing "longstanding rule" is akin to the rule of lenity in criminal law and thus is to be applied only as a rule of last resort. See pl. op. ¶¶ 16–17. None of the parties made any such argument in this case, the plurality cites no case so holding, nor have I seen one. Accordingly, although I understand the plurality's desire to avoid the settled rule that ambiguous tax provisions will be construed against the taxing authority,[11] I do not believe that it can properly do so here.

## B. Furnishing Lodging

¶55 Section 53-167(b) of the Code provides, in pertinent part, "[E]very vendor who shall make a sale of lodging to a purchaser in the city shall collect the tax imposed by this article to the total purchase price charged for such lodging furnished at any one (1) time by or to every customer or buyer." Denver, Colo., Revised Municipal Code § 53-167(b) (2016).

---

[11] To reach its conclusions, the plurality must strain against the text of the municipal ordinances at issue and ignore reasonable interpretations thereof that differ from its own.

¶56 The Code defines "vendor" as "a person making sales of or furnishing lodging to a purchaser in the city." § 53-170(8).

¶57 "Sale," in turn, is defined as the "furnishing for consideration by any person of lodging within the city." § 53-170(4).

¶58 The question presented here is, thus, whether the OTCs furnished lodging within the meaning of the Code, thereby rendering them "vendors" subject to Denver's lodging tax.

¶59 Under the Code,

> [l]odging shall mean rooms or accommodations for overnight use furnished by any person or the representative of any person to any person who for consideration uses, possesses, occupies or has the right to use, possess or occupy any such room or accommodation in a hotel, apartment hotel, lodging house, motel, motor hotel, guest house, guest ranch, resort, mobile home, mobile home park, auto court, inn, trailer court, trailer park or hotel, under any concession, permit, lease, contract, license to use or other similar arrangement.

§ 53-170(2).

¶60 Accordingly, "lodging" is a room or accommodation for overnight use; it is not the right to use a room, as the plurality states. See pl. op. ¶ 23. Because it is undisputed that the OTCs have not provided either rooms or accommodations, in my view, they have not furnished "lodging" within the meaning of the Code. As a result, they are not "vendors" subject to Denver's lodging tax.

¶61 In reaching this conclusion, I acknowledge that section 53-170(2)'s definition of "lodging" refers to the right to use a room or accommodation. As I read that portion of the definition, however, the phrase "right to use, possess, or occupy any such room or

4

accommodation" modifies "any person" who has that right. § 53-170(2). Thus, in my view, the section plainly means that lodging is a room or accommodation furnished to any person who has the right to use, possess, or occupy that room or accommodation. Id. To construe this provision to define "lodging" simply as the right to use a room or accommodation would read words out of the ordinance, and we cannot do that. See City of Littleton, ¶ 27, 370 P.3d at 166.

¶62 Even if the language of the ordinance could reasonably be construed to define lodging as the right to use a room or lodging, however, any such reading would be one of multiple reasonable constructions. Accordingly, at best, this provision is ambiguous, and therefore, we must construe it against the city and in favor of the OTCs. See City of Boulder, 72 P.3d at 367.

¶63 For these reasons, I would conclude that the OTCs have not furnished lodging to customers and, thus, are not "vendors" subject to Denver's lodging tax.

## C. Fees Charged By The OTCs

¶64 With respect to the fees charged by the OTCs, section 53-171(c) of the Code provides, "The purchase price paid or charged for lodging shall exclude the price paid by the purchaser for any goods, services or commodities other than those directly connected with, and included in the price of, the furnishing of rooms or accommodations." Thus, the purchase price that a customer pays to an OTC includes any fees "directly connected with" the furnishing of rooms or accommodations. See § 53-171(c).

¶65 The question presented here thus becomes whether the fees charged by the OTCs to their customers were directly connected with or part of the purchase price for furnishing rooms or accommodations, so as to render them subject to Denver's lodging tax.

¶66 As noted above, under my reading of the pertinent provisions of the Code, the OTCs did not furnish rooms or accommodations to their customers. Thus, by definition, the fees that the OTCs charged were not directly connected with or part of the purchase price for furnishing rooms or accommodations, and therefore, they were not subject to Denver's lodging tax.

## II. Conclusion

¶67 For these reasons, I respectfully dissent.

I am authorized to state that CHIEF JUSTICE RICE and JUSTICE EID join in this dissent.